UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                :

MARIA GARCIA,                    :
                                :

                 Plaintiff,    :

                                :

         - against -             :
                                :

BARCLAYS CAPITAL, INC., et al.,    :
                                :

                 Defendants    :
                                :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___11/15/2017___

13-CV-5308 (VSB)

**MEMORANDUM & OPINION**

Appearances:

Anne L. Clark
Vladeck, Raskin & Clark, P.C.
New York, New York
*Counsel for Plaintiff*

Patrick W. Shea
Emily R. Pidot
Paul Hastings LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Maria Garcia ("Plaintiff" or "Garcia") brings this employment discrimination

action against Defendants Barclays Capital, Inc. and Barclays Bank PLC (together, "Barclays" or

"Defendants").  Plaintiff asserts claims of unlawful employment discrimination in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the New York

State Human Rights Law, N.Y. Exec. Law § 290e *et seq*. ("NYSHRL"), the New York City

Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq*. ("NYCHRL"), and Section 1981 of

the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  Plaintiff also asserts claims

under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") and the New York State Labor Law § 194

("NYLL") related to Defendants' alleged failure to pay their male and female employees equal wages. Before me is Defendants' motion for summary judgment on all Plaintiff's claims. Because there is no genuine dispute of material fact relating to Plaintiff's employment discrimination claims and because Plaintiff has failed to demonstrate that her race or sex was a motivating factor in the adverse employment acts, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's causes of action under Title VII, NYSHRL, and Section 1981. Because there is no genuine dispute of material fact relating to Plaintiff's unequal pay claims and because Barclays has proven its affirmative defense that it relied on factors other than sex in determining compensation, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's causes of action under the EPA and NYLL. In light of the fact that Plaintiff's federal claims are dismissed, I decline to exercise supplemental jurisdiction with respect to Plaintiff's cause of action under the NYCHRL, and thus those claims are dismissed without prejudice to them being asserted in state court.

## I. __Background__

### A. *Barclays Hires Garcia*

Garcia is a Latina woman, and was born and raised on Long Island, New York to a Dominican father and an El Salvadoran mother. (Defs.' 56.1 ¶¶ 40, 60.)[1] In August 1997, Garcia began her employment at Lehman Brothers ("Lehman"), an international investment bank, as a sales assistant on Lehman's Emerging Markets ("EM") Sales desk. (*Id.* ¶¶ 41, 43.) Between 1997 and 2006, Lehman promoted Garcia three times: to Junior Salesperson in 1999;

---

[1] "Defs.' 56.1" refers to Defendants' Reply to Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated July 23, 2015 ("Defendants' Reply 56.1"). (Doc. 77.) In compliance with my Individual Rule, Defendants' Reply 56.1 aggregates the parties' statements, responses, and replies, and thus references in the Memorandum & Opinion to individual paragraphs are to Defendants' statements, Plaintiff's responses, Defendants' replies, or some combination thereof.

to Vice President in 2001; and to Director in 2006. (*Id*. ¶¶ 44, 45, 47.) During her final six years at Lehman, Garcia reported to Robert Koch, a managing director and the head of New York EM Sales. (*Id*. ¶ 50.)

Lehman's holding company filed for Chapter 11 bankruptcy protection on September 15, 2008, and Barclays, an international investment bank, acquired portions of Lehman's business, including Lehman's EM Sales group. (*See id.* ¶ 42; The New York Times, http://www.nytimes.com/2008/09/15/business/15lehman.html (last visited Oct. 2, 2017).) In connection with Barclays's acquisition of Lehman's EM Sales group, Andrew Gold, a managing director at Barclays and the head of Barclays' New York EM Sales, interviewed Garcia for a position at Barclays and offered Garcia a position in EM Sales on the Nobramex[2] team at Barclays. (Defs.' 56.1 ¶¶ 1, 54.) In addition to Garcia, Barclays hired Koch to work as a salesperson on the U.S. EM Sales team; Koch reported to Gold from the time he joined Barclays in 2008 until Gold's departure in 2014. (*Id*. ¶ 55; Koch Decl. ¶ 1.)[3] In August or September 2009, Koch became the head of the U.S. EM Sales team, and Gold remained his direct manager. (Defs.' 56.1 ¶ 55.)

In March 2009, Gold promoted Garcia to head of the Nobramex team, on a probationary basis. (*Id*. ¶¶ 4, 80.) In May 2009, Gold made the promotion permanent. (*Id*. ¶ 87.) In the summer of 2009, Gold nominated Garcia for Barclays' Woman of the Year Award; in support of his nomination of Garcia, Gold wrote that Garcia was "an outstanding leader and she continues to maintain an unwavering focus on her clients and her colleagues." (*Id*. ¶ 6.) In response to

---

[2] "Nobramex" refers to all of Latin America except Brazil and Mexico: "Not Brazil and Mexico." (Koch Dep. 71:22-72:2.) "Koch Dep." refers to the transcript of the January 26, 2015 deposition of Robert Koch, excerpts from which are attached as Exhibit 3 to the Shea Affirmation. (Doc. 60-3.)

[3] "Koch Decl." refers to the Declaration of Robert Koch, dated May 14, 2015, submitted in support of Defendants' motion for summary judgment. (Doc. 56-43.)

being nominated, Garcia wrote to Gold, thanking him "so very much." (*Id*.) Garcia was selected as one of fourteen finalists out of 411 nominees for the Woman of the Year Award. (*Id*. ¶ 7.)

Gold rated Garcia's performance "A (mid)" in his 2009 mid-year evaluation of Garcia. (*Id*. ¶ 90.) In addition, Gold wrote that Garcia "has done extremely well taking over the Nobramex team . . . . She stepped up and has proven that she is an efficient manager as well as producer. She is looked up to by others on the desk and is viewed as extremely reliable . . . . I believe Maria is one of the most important resources on the desk . . . ." (*Id*.) In reviewing Garcia's work to set her compensation for 2009, Gold determined that Garcia had a good year in 2009, and that she was "off to a good start." (*Id*. ¶ 97.) In his 2009 year-end review, Gold rated Garcia's performance "A (high)," the highest possible rating. (*Id*. ¶¶ 97, 163.)

## B. *Gold Reassigns Garcia's U.S. Accounts*

During her tenure at Lehman, the majority of Garcia's "accounts were with US-based clients." (Garcia Decl. ¶ 4.)[4] When Garcia joined Barclays she continued to cover certain U.S. accounts that she had covered while at Lehman, but she did not continue to cover all of the accounts that she had when she was at Lehman. (*Id*. ¶¶ 6, 8, 9, 14.) For example, Garcia covered JP Morgan at Lehman, but never covered JP Morgan while at Barclays. (*Id*. ¶ 8.) In January 2010, Gold reassigned the hedge fund accounts Garcia had been covering to salespeople in U.S. EM Sales who worked under Koch. (*Id*.; Defs.' 56.1 ¶ 99; Koch Decl. ¶¶ 2, 3.) Gold stated that the decision to reassign the U.S. accounts was based on the preference for keeping U.S. production and Nobramex production separate from one another. (Defs.' 56.1 ¶ 99.) Gold returned certain of these U.S. accounts to Garcia in or around January 2011, including

---

[4] "Garcia Decl." refers to the Declaration of Maria Garcia in opposition to Defendants' motion for summary judgment, dated July 2, 2015. (Doc. 71.)

Discovery, Fortress, QVT, and Traxis Partners.  (Defs.' 56.1 ¶¶ 18, 25; Garcia Decl. ¶ 32.)

### C. *Gold Nominates Garcia for Promotion to Managing Director*

In March 2010, Gold nominated Garcia for promotion to managing director.  (Defs.' 56.1 ¶ 108.)  Gold wrote that he nominated Garcia in 2010 because "he thought she was off to a great start in running Nobramex, she had made a lot of progress, and she deserved the nomination." (*Id*.)  Garcia was the only candidate Gold nominated for promotion to managing director in 2010, (*id*. ¶ 13), and was the only non-white nominee from EM Sales that year, (*id*. ¶ 109).  Garcia's candidacy advanced to the final round of the process; however, Garcia was not selected for promotion to managing director.  (*Id*. ¶ 111.)

The Global Partnership Committee (the "GPC") was a group of senior Barclays managers who reviewed candidates for managing director, and at the time was composed of two women and only one non-white member, a non-Latino man.  (*Id*. ¶ 119.)  The GPC decided not to promote Garcia in 2010 because it concluded "she did not have enough production exclusively under her name" and she had "not yet had time to develop a revenue track record of performance against budget and she has not been able to prove her people management capabilities."  (Shea Aff. Ex. 26; *see* Defs.' 56.1 ¶¶ 111, 119.)[5]  When Gold told Garcia the GPC did not select her for promotion, he told her that he did not want a "pity party" from her, and no more "Mama Maria." (Defs.' 56.1 ¶ 115.)

Gold again nominated Garcia for promotion to managing director in 2011; however, Garcia removed herself from consideration.  (*Id*. ¶ 26.)  Garcia spoke with a Barclays human resources representative and they agreed that Garcia should focus on getting her compensation

---

[5] "Shea Aff." refers to the Affirmation of Patrick W. Shea, dated May 18, 2015, submitted in support of Defendants' motion for summary judgment.  (Doc. 60.)

higher in 2011 and then turn her attention to a higher corporate title. (*Id.*)

In 2012, Gold placed Garcia on his preliminary "long list" of candidates for managing director, but he ultimately did not advance her for promotion "because she had not improved her production or performance, and he thought it was unlikely the committee would promote her." (*Id.* ¶ 31.)

### D. *Barclays Undergoes a Series of Reductions in Force*

In January 2011, Barclays underwent a reduction in force ("RIF"). (*Id.* ¶¶ 22, 165.) In connection with the 2011 RIF, Gold was required to select three roles in EM Sales for redundancy and layoff. (*Id.* ¶ 22.) Gold consulted Pamela Sinclair in Barclays' human resources department regarding whether to include Garcia in the 2011 RIF. (Gold Decl. ¶ 2.)[6] Sinclair worked in Barclays' human resources department from 1996 until 2013, and between 2005 and 2013 she was a Director in that department. (Sinclair Decl. ¶ 1.)[7] Sinclair supported the Markets division which included EM Sales where Gold and Garcia worked. (*Id.* ¶ 2.) Sinclair urged Gold to include Garcia in the 2011 RIF, (Defs.' 56.1 ¶ 23), because in her opinion Garcia was not performing well, did not demonstrate potential for long-term success, and her belief that Garcia's role was not needed, (Sinclair Decl. ¶ 3).[8] Gold did not adopt Sinclair's recommendation to select Garcia's role for redundancy and did not include Garcia in the 2011 RIF. (*Id.* ¶ 3; Defs.' 56.1 ¶ 24.) Instead Gold presented Garcia with three options: (1) volunteer for the RIF and take a severance package; (2) transfer to the U.S. EM Sales team or look for

---

[6] "Gold Decl." refers to the Declaration of Andrew Gold, dated May 13, 2015, which was submitted in support of Defendants' motion for summary judgment. (Doc. 56-42.)

[7] "Sinclair Decl." refers to the Declaration of Pamela Sinclair, dated May 15, 2015, which was submitted in support of Defendants' motion for summary judgment. (Doc. 56-44.)

[8] Sinclair left Barclays in about 2013 and now works at another financial institution in a human resources role. (*See* Sinclair Decl. ¶ 1.)

other opportunities within Barclays; or (3) stay in her current role and improve her production and performance. (Defs.' 56.1 ¶ 24.) After considering these options, Garcia decided to remain in her role as head of the Nobramex team in EM Sales. (*Id*. ¶ 25.) In addition, Gold assigned Garcia some U.S. accounts to help her increase her production; the U.S. accounts that Gold assigned to Garcia included certain of the accounts Garcia had covered while she was at Lehman that had been reassigned to others in 2010, including Discovery, Fortress, QVT, and Traxis Partners. (*Id*. ¶¶ 18, 25.)

Barclays underwent another RIF in February 2013. (*Id.* ¶ 32.) Gold selected Garcia's position for redundancy and included her in the 2013 RIF. (*Id*.) Gold stated that he based this decision on Garcia's low performance, low production, and his belief that her position was not necessary going forward. (*Id*.; Gold Decl. ¶ 5.) Garcia's position was not re-filled. (Defs.' 56.1 ¶ 34.) After Garcia's employment was terminated as part of the 2013 RIF, Gold assigned management of the Nobramex team to David Huerta, who was then the head of the Mexico EM Sales. (*Id.*; Gold Decl. ¶ 5.) Huerta was also given management of Brazil. (Defs.' 56.1 ¶ 32.)

In 2014, Barclays underwent another RIF; Gold's position was selected for redundancy and he was included in the 2014 RIF. (Gold Decl. ¶ 1.) As a result, Gold is no longer employed by Barclays. (*Id*.) As of May 2015, Koch—who continued to report to Gold until Gold's departure from Barclays—remains employed by Barclays as head of the U.S. EM Sales team. (Koch Decl. ¶ 1.)

**E.** ***Barclays' Total Compensation Program and Garcia's Compensation***

Barclays compensates its employees based on a total compensation program consisting of base fixed pay, discretionary incentive awards, and benefits. (Defs.' 56.1 ¶ 37.) Discretionary incentive awards are determined at Barclays' sole discretion and are not guaranteed. (*Id*.)

Barclays rewards eligible employees based on the following factors: individual and team performance, meeting or exceeding established goals, market competitiveness, and the overall success of each business, including Barclays' overall performance. (*Id.*) Specifically, with respect to the total compensation program, the Barclays employee handbook states:

> Barclays goal is to offer a total compensation program that is competitive in its market and supportive of the business strategies in order to attract, retain, and motivate talented employees. Barclays pays for individual performance within the context of factors such as job position, business results, including the overall performance of the firm, and geography. Barclays compensation is designed to support these goals by ensuring that employees receive fair, equitable and competitive pay for the job that they perform.

(Shea Aff. Exs. 16–20.)

Pursuant to the terms of her offer letter, (Shea Aff. Ex. 5), Garcia was paid $700,000 in total compensation for her work in 2008. (Defs.' 56.1 ¶ 3.) This compensation consisted of a $200,000 annual salary and $500,000 in cash and stock incentive payments. (*Id.*) Garcia's 2008 bonus was guaranteed from Lehman. (*Id.*) For the 2009 performance year, Barclays paid Garcia $1,000,000 in total compensation, which was comprised of $200,000 in salary, $35,000 in a one-off payment, and $765,000 in discretionary incentive awards. (*Id.* ¶ 10.) For the 2010 performance year, Barclays paid Garcia $605,000 in total compensation, which was comprised of $200,000 in salary, $85,000 in fixed payments, and $320,000 in discretionary incentive awards. (*Id.* ¶ 20.) For the 2011 performance year, Barclays paid Garcia $720,000 in total compensation, which was comprised of $200,000 in salary, $85,000 in fixed payments, and $435,000 in discretionary incentive awards. (*Id.* ¶ 29.) For the 2012 performance year, Barclays paid Garcia $285,000 in total compensation, which was comprised of $200,000 in salary and $85,000 in fixed payments. (*Id.* ¶ 35.)[9]

---

[9] Garcia was ineligible to receive a discretionary incentive award for 2012 because she was no longer in active

Garcia's total production in 2009 was $10,102,134. (*Id*. ¶ 8.) Garcia's total production in 2010 was $3,603,858. (*Id*. ¶ 16.) In light of the 64% decrease in Garcia's production from 2009 to 2010, Gold instructed Garcia to focus on her personal and the Nobramex team production, and set a goal of $20 million for Garcia's total personal production in 2011. (*Id*. ¶ 18.) Garcia's total personal production in 2011 was $8,669,090. (*Id*. ¶ 27.)[10] Garcia's total production in 2012 was $3,799,215. (Defs.' 56.1 ¶ 33.)[11] According to Garcia, Gold had a narrow focus on individual production in determining discretionary incentive awards for the employees he managed. (Defs.' 56.1 ¶ 117.) Garcia understood this and asked Gold, on several occasions, to help her reconfigure or reallocate the sales production revenue for the Nobramex desk so that the production totals more accurately reflected her contribution. (*Id*. ¶ 116.)

## II.   **Procedural History**

Plaintiff commenced this action by filing her Complaint on July 30, 2013. (Doc. 1.) Plaintiff filed her Amended Complaint on November 18. (Doc. 12.)

Defendants filed their motion for summary judgment on May 19, 2015, (Doc. 57), along with Defendants' Local Civil Rule 56.1 Statement, (Doc. 58), a memorandum of law in support of the motion, (Doc. 59), the affirmation of Patrick W. Shea with exhibits, (Doc. 60), and declarations of Andrew Gold, Robert Koch, and Pamela Sinclair, (Docs. 61, 62, 63). On July 21, 2015, Garcia filed Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment, (Doc. 73), Plaintiff's Local Civil Rule 56.1 Statement, (Doc. 70), the declaration of Anne L. Clark with exhibits, (Doc. 72), and the declaration of Maria Garcia, (Doc.

---

working status at Barclays when the awards were paid in 2013. (Defs.' 56.1 ¶ 39.)

[10] Garcia claims her total personal production in 2011 was $9,269,056. (Clark Decl. Ex. 63.) "Clark Decl." refers to the Declaration of Anne L. Clark, dated July 2, 2015, submitted in support of Plaintiff's opposition to defendant's motion for summary judgment. (Doc. 72.)

[11] Garcia claims her total personal production in 2012 was $4,092,000. (Clark Decl. Ex. 79.)

71).[12]  On July 23, 2015, Defendants filed their reply memorandum of law in further support of the motion for summary judgment, (Doc. 78), the affirmation of Patrick W. Shea with exhibits, (Doc. 79), and the declaration of Robert Koch with exhibit, (Doc. 80), at which point the motion was fully submitted.[13]

### III.  <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

---

[12] As set forth in the parties' joint letter, (Doc. 67), Plaintiff served her opposition papers on Defendants on July 2, 2017; the parties then met and conferred regarding necessary redactions, and Plaintiff's opposition papers were filed on the docket on July 21, 2017.

[13] On September 4, 2015, Plaintiff submitted a letter providing notice of supplemental authority regarding *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 87 (2d Cir. 2015).  (Doc. 87.)

(1986). "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may," among other things,

"consider the fact undisputed for purposes of the motion" or "grant summary judgment if the

motion and supporting materials—including the facts considered undisputed—show that the

movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the

evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in its favor, and may grant summary judgment only when no reasonable trier of fact could find in

favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal

citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any

evidence in the record that could reasonably support a jury's verdict for the non-moving party,"

summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d

Cir. 2002).

The Second Circuit "has repeatedly emphasized the need for caution about granting

summary judgment to an employer in a discrimination case where . . . the merits turn on a

dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d

Cir. 2010) (internal quotation marks omitted). This is "[b]ecause direct evidence of [an

employer's] discriminatory intent is rare and such intent often must be inferred from

circumstantial evidence." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001). "Even in

the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts.'" *Gorzynski*, 596 F.3d at 101 (quoting *Matsushita*, 475 U.S. at 586) (internal citation omitted). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV. <u>Discussion</u>

### A. *Discrimination Claims Under Title VII, Section 1981, and NYSHRL*

Employment discrimination claims under Title VII, Section 1981, and NYSHRL are analyzed using the familiar three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). At the first step of the *McDonnell Douglas* analysis, a plaintiff must present evidence supporting a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To meet this burden, a plaintiff must show that: (i) she belongs to a protected class; (ii) she was qualified for the position at issue; (iii) she suffered an adverse employment action; and (iv) the action occurred under circumstances giving rise to an inference of discriminatory intent. *See id.*; *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The Second Circuit has emphasized that the "burden of establishing a *prima facie* case is *de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).

If a plaintiff successfully presents a prima facie case of discrimination, the burden shifts to the defendant to proffer legitimate, nondiscriminatory reasons for the adverse employment action. *Id.* at 466, 468–69. The defendant's burden at this stage is also "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). It "is one of production, not persuasion; it

'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("*Hicks*")).

At the third step of the *McDonnell Douglas* framework, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the proffered reason is a pretext for discrimination. *See United States v. City of N.Y.*, 717 F.3d 72, 102 (2d Cir. 2013); *Holcomb*, 521 F.3d at 141. However, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) (noting that "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus"). In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (internal quotation marks omitted)); *Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir. 2000) (holding summary judgment in favor of defendant was appropriate where plaintiff failed to present evidence upon which a reasonable jury could conclude that age was a "determinative factor" in adverse employment action). "Though the plaintiff's ultimate

burden may be carried by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' it may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin v. Aetna Life Inc. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *see Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (noting that in support of her claim of sex discrimination "plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more").

### 1. Prima Facie Case

It is undisputed that Garcia is a Latina woman and was qualified for the positions she held at Barclays. (Defs.' 56.1 ¶¶ 40, 43.) Therefore, Garcia satisfies the first and second elements of her prima facie claim. With respect to the third element, it is undisputed that Garcia experienced the following adverse employment acts: (i) failure to promote to managing director; (ii) low discretionary incentive awards; (iii) reassignment of her U.S. accounts; and (iv) selection for redundancy in the 2013 RIF. The parties dispute, however, whether Garcia has demonstrated her prima facie claim with respect to the fourth element—that these adverse employment acts occurred under circumstances giving rise to an inference of discrimination. Garcia argues that numerous comments allegedly made by Gold during her tenure at Barclays give rise to an inference of discrimination. (Pl.'s Opp. 9–12.)[14] Defendants respond that the alleged statements consist of classic "stray comments" and thus do not give rise to an inference of discrimination based on race or sex. (Defs.' Reply 2–3.)[15]

---

[14] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. (Doc. 73.)

[15] "Defs.' Reply" refers to Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

In analyzing whether a statement is probative of discriminatory intent or may instead be considered a "stray comment," "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "But there is no bright-line rule for when remarks become 'too attenuated' to be significant to a determination of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015) (vacating district court finding that discriminatory statements were "stray remarks," holding statements were sufficient to demonstrate prima facie case of discrimination, and remanding for analysis at the second and third stages of *McDonnell Douglas* burden-shifting framework). Accordingly, in determining whether a statement evidences discriminatory intent or whether it is a "stray remark," a court should consider the following factors:

> (1) who made the remark, *i.e.*, a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decision-making process.

*Pronin v. Raffi Custom Photo Lab, Inc.*, 383 F. Supp. 2d 628, 637 (S.D.N.Y. 2005) (citing *Minton v. Lenox Hill Hosp.*, 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2001)); *see Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000 (BSJ)(AJP), 2011 WL 70386, at *7 (S.D.N.Y. Jan. 4, 2011) (noting that "[r]emarks are especially likely to be considered 'stray' when made by a decision maker unrelated to the decision-making process temporally remote from the date of decision").

---

(Doc. 78.)

Garcia argues that Gold made numerous statements that, taken together, give rise to an inference of discrimination based on race and sex. Specifically, Garcia alleges that Gold:

(1)     told Garcia around the time she joined Barclays in 2008 that she would be a good "fit" for Nobramex, because she is Latina, (Defs.' 56.1 ¶ 60);

(2)     referred, in March and May 2009, to Nobramex as a "no man's land" and a "cucaracha" region where one could "rape and pillage" local investors, (*id.* ¶¶ 64, 74, 81; Clark Decl., Ex. 82 ¶ 18);

(3)     referred to Garcia, on numerous occasions, as a "high end Dominican" and "Miss Dominican Republic," (Defs.' 56.1 ¶ 211; Garcia Dep. 338:24-340:19)[16];

(4)     referred to Garcia, in September 2010, as "Mama Maria," told her he did not want a "pity party," and once asked her to "mother" a colleague's health issue, (Defs.' 56.1 ¶ 115);

(5)     told Koch, on an unspecified date, that he was "going to drop the Cosby kids" as he left for the restroom, (*id.* ¶ 105);

(6)     said, on an unspecified date, "this is what happens when you spend time in Asia," while playing a YouTube video of a Barclays employee "going postal," (Garcia Dep. 346:3-17);

(7)     said, in January 2011 and on other occasions, Arabs could not be trusted, (Defs.' 56.1 ¶ 104);[17]

(8)     said, in January 2011, that it was time to put a female colleague "out to pasture" following that employee's second maternity leave, (*id.* ¶ 166);

(9)     wrote in an email sent in June 2011 that he was "off to beat my wife with the belt," (*id.* ¶ 193); and

(10)    said while boarding a plane in 2012: "uh oh, this plane has Dominicans on it," (*id.* ¶ 210).

These statements allegedly made by Gold at various times between 2008 and 2012 are unprofessional and arguably offensive. However, the fact that the statements may be offensive is beside the point; the relevant inquiry is whether or not the statements are probative of a

---

[16] "Garcia Dep." refers to the transcript of the December 4, 2014 deposition of Maria Garcia. (Doc. 60-1).

[17] Garcia does not argue that the statements at (5) through (7) were about her or were directed at members of her protected classes. It is clear that these statements were not directed at Garcia or at Latinas.

discriminatory intent.  *See Tomassi*, 478 F.3d at 116 ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.").  The individual who made each statement, i.e., Gold, is also the decision-maker with respect to the adverse employment acts.  However, the other three factors suggest the statements are "stray comments" because, to varying degrees:  their content is benign when considered in the context they were made; they are temporally remote from an adverse employment action; and/or they are unrelated to an employment decision or the decision making process.  *See id.*; *O'Connor v. Viacom Inc./Viacom Int'l Inc.*, No. 93 CIV. 2399 (LMM), 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23), *aff'd*, 104 F.3d 356 (2d Cir. 1996) (holding plaintiff failed to demonstrate pretext where employer allegedly referred to Irish employees in derogatory terms and emphasizing that "[m]any courts have held that stray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment").

However, in considering all of the statements together in the light most favorable to Garcia, I decline to rule as a matter of law that the statements are mere "stray remarks."  *See Tolbert*, 790 F.3d at 437 (reversing grant of summary judgment and holding that "none of the remarks was so attenuated that it should be ignored"); *see also Tomassi*, 478 F.3d at 116 (same).  I find that these statements could plausibly support a claim that Plaintiff was terminated under circumstances giving rise to an inference of discrimination.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (noting that although stray comments alone are usually not sufficient proof to show discrimination, stray comments may "bear a more ominous significance" when considered within the totality of all the evidence and can furnish support for

plaintiff's prima facie case).  Therefore, I find that Garcia has just barely satisfied the de minimis showing necessary to establish a prima facie case of discrimination based on race and/or sex. *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (reiterating that prior Second Circuit precedents "characterized the evidence necessary to satisfy this initial [prima facie] burden as 'minimal' and '*de minimis*'").

## 2. Barclays' Legitimate Non-discriminatory Explanations

I turn next to the second stage of the *McDonnel-Douglas* burden-shifting analysis, where Barclays' burden is also "light."  *Greenway*, 143 F.3d at 52.  Barclays need only adduce evidence supporting a legitimate, non-discriminatory explanation for each of the adverse employment acts.  *Reeves*, 530 U.S. at 142 (noting that the burden "is one of production, not persuasion; it 'can involve no credibility assessment'" (quoting *Hicks*, 509 U.S. at 509)).  Barclays has more than satisfied its second stage burden; it offers sufficient admissible evidence from which a reasonable jury could conclude that Gold took each of the adverse employment actions for one or more legitimate, non-discriminatory reasons.

### a. Failure to Promote to Managing Director

Garcia claims that Barclays' failure to promote her to managing director in 2010 and 2012 was motivated, at least in part, by her race and/or sex.  (Pl.'s Opp. 15–17.)  In response, Barclays demonstrates that the ultimate decision not to promote Garcia to managing director was based on legitimate, non-discriminatory reasons.[18]

With respect to the failure to promote in 2010, Garcia's candidacy advanced to the final stages; however, the GPC decided not to promote Garcia because it concluded "she did not have

---

[18] The undisputed evidence demonstrates that Gold considered or nominated Garcia for promotion to managing director in 2010, 2011, and 2012.  (Defs.' 56.1 ¶¶ 13, 26, 31.)  In 2011, Garcia withdrew her candidacy because she believed she was unlikely to be promoted.  (*Id.* ¶ 26.)

enough production exclusively under her name" and she had "not yet had time to develop a revenue track record of performance against budget and she ha[d] not been able to prove her people management capabilities." (Shea Aff. Ex. 26; *see* Defs.' 56.1 ¶¶ 111, 119.) In 2012, Gold placed Garcia on his initial long list of candidates but ultimately did not advance her candidacy "because she had not improved her production or performance, and he thought it was unlikely the committee would promote her." (Defs.' 56.1 ¶ 31.) Based on this evidence, I find that Barclays has more than satisfied its second stage burden with respect to Garcia's non-promotion to managing director.

b. Discretionary Incentive Awards

Garcia argues that between 2009 and 2012 she received lower discretionary incentive awards than certain men, most of whom were white, on account of her race and/or sex. (Pl.'s Opp. 17–18.) In response, Barclays explains that the disparities in Garcia's discretionary incentive awards are attributable to her consistently and substantially lower total production figures. Specifically, Barclays references the employee handbook which states that discretionary incentive awards are based on "individual and team performance, meeting or exceeding established goals, market competitiveness, and the overall success of each business, including the firm's overall performance." (Defs.' 56.1 ¶ 37.)[19] Additionally, Barclays demonstrates that an employee's total production is a key component in assessing individual performance, and individual performance, in turn, is a major factor in determining an employee's discretionary incentive award. (Defs.' Reply 6; Defs.' Mem. 17; Gold Dep. 161:3-162:23.)[20] In light of Barclays' substantial evidence demonstrating that individual production was a key factor in

---

[19] It is undisputed that each of these factors had legitimate business purpose.

[20] "Defs.' Mem." refers to Memorandum of Law in Support of Defendants' Motion for Summary Judgment. (Doc. 59.) "Gold Dep." refers to the transcript of the December 17, 2014 deposition of Andrew Gold. (60-2.)

determining discretionary incentive awards, I find that Barclays has more than satisfied its second stage burden with respect to Garcia's discretionary incentive awards.

### c.  Reassignment of Garcia's U.S. Accounts

Garcia argues that Gold's decision to reassign her U.S. accounts was motivated by race. (Pl.'s Opp. 15.)[21]  When Gold reassigned Garcia's U.S. accounts in January 2010, he explained that the decision was premised on a Barclays "preference for keeping U.S. revenues and Nobramex revenues segregated from one another."  (Defs.' 56.1 ¶ 99.)  Because Garcia had been covering U.S. accounts, it was unclear how to apportion the total revenues attributable to the U.S. EM Sales and Nobramex EM Sales teams.  In addition, as Barclays points out, four of the accounts were re-assigned to Ana Sarmiento, a Latina, (Pl.'s Opp. 15; *see* Koch Decl. ¶ 3), and Gold returned certain of Garcia's U.S. accounts in 2011, (Garcia Decl. ¶ 32).  Based on this evidence, I find that Barclays has more than satisfied its second stage burden with respect to Gold's decision to reassign Garcia's U.S. accounts.

### d.  Termination of Employment as Part of 2013 RIF

Barclays has adduced sufficient evidence to demonstrate that Gold's decision to include Garcia in the 2013 RIF was based on legitimate business reasons and needs.  When Barclays underwent the 2013 RIF, Gold selected Garcia for redundancy because her position was not necessary going forward.  (Defs.' 56.1 ¶ 32.)  Specifically, Gold decided to eliminate Garcia's position—head of Nobramex—and combine the Nobramex and Mexico teams into a single team with Huerta serving as its head.  (Gold Decl. ¶ 5 ("I felt that [Garcia's] role could be eliminated and the Nobramex team could report into the head of the Mexico sales team, David Huerta.").)

---

[21]  Garcia's claim regarding the reassignment of her U.S. accounts in 2010 arises only under Section 1981, and the parties have stipulated that any challenge to the account reassignment other than under Section 1981 is time-barred. (Defs.' Mem. 13 n.12.)

Dreisiger recalls that in discussing with Gold whether to include Garcia in the 2013 RIF, the "conversation was about whether her business, the NoBraMex business, [could] be folded under the head of the Mexico business, as [Huerta] had a stronger track record and there could be better synergies and then [Gold] didn't need as many senior managers."  (Dreisiger Dep. 175:8-19.)[22] Based on this evidence, I find that Barclays has more than satisfied its second stage burden with respect to Gold's decision to select Garcia's position for redundancy and include Garcia in the 2013 RIF.

### 3.    Pretext

At this stage of the *McDonnell Douglass* burden shifting framework, Garcia must prove, by the preponderance of evidence, that the adverse employment actions were motivated at least in part by her race or sex.  *See Stern*, 131 F.3d at 312; *Reeves*, 530 U.S. at 143 ("Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas* ] framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (internal quotation marks omitted)).  In determining whether Garcia has carried her burden, I consider the evidence contained in the record as a whole, and resolve all conflicts in the evidence and draw all reasonable inferences in Garcia's favor.  *See Weinstock*, 224 F.3d at 42.  As set forth below, I conclude that no reasonable jury could find that Garcia's race or sex was a motivating factor in any of the adverse employment acts.  In addition, although she is not required to disprove Barclays' explanations to defeat summary judgment, Garcia fails to demonstrate that any of Barclays' legitimate, non-discriminatory explanations for the adverse acts are pretexts.

---

[22] "Dreisiger Dep." refers to the transcript of the February 27, 2015 deposition of Sheri Dreisiger.  (Doc. 60-4.)

a.  <u>Non-Promotion to Managing Director</u>

Garcia has failed to rebut Barclays' legitimate, non-discriminatory reasons for not promoting her to managing director.  She argues that her candidacy in 2010 was destined to fail because Gold did not "put the level of effort into Garcia's nomination papers that he did for McNulty," (Pl.s' Opp. 16), and because the committee deciding who to promote was composed of almost entirely white men, (Pl.s' Opp. 17).  Plaintiff's conclusory assertions fail to establish that Barclays' legitimate reasons are pretexts.

The undisputed facts belie Plaintiff's assertion that Gold was not supportive of her generally, and specifically of her candidacy for managing director.  Garcia points to emails between Koch, Gold, and other Barclays executives regarding McNulty's nomination and argues that Gold did not exert an equivalent level of effort with respect to her nomination.  (Defs.' 56.1 ¶ 125.)  Consistent with Garcia's claim that Koch nominated McNulty and Gold nominated only her for promotion to managing director in 2010, (*Id.* ¶ 13), the emails Garcia points to demonstrate that Gold took a relatively less active role than Koch in crafting McNulty's nomination package.  (*See* Clark Decl. Exs. 53, 54, 57.)  However, the email chain fails to establish that Gold failed to sufficiently advocate on Garcia's behalf in light of the other evidence contained in the record.  In 2009, Gold nominated Garcia for the Barclays Woman of the Year award and wrote that Garcia was "an outstanding leader and she continues to maintain an unwavering focus on her clients and her colleagues."  (Defs.' 56.1 ¶ 6.)  In addition, it is undisputed that Gold nominated or considered Garcia for promotion to managing director in 2010, 2011, and 2012.  (*Id.* ¶¶ 13, 26, 108.)  Gold wrote that he nominated Garcia in 2010 because "he thought she was off to a great start in running Nobramex, she had made a lot of progress, and she deserved the nomination."  (*Id.* ¶ 108.)  Moreover, Garcia acknowledges that

she was the only candidate Gold nominated for promotion in 2010. (*See id.* ¶ 13.) Construing the inconsistencies and facts in Garcia's favor, I find that Garcia's assertion that Gold essentially did not work hard enough on her nomination is unpersuasive.

In addition, there is also no basis to conclude that the committee's stated reason not to promote Garcia in 2010 was a pretext for discrimination. In support, Garcia merely states that the committee was composed of almost entirely white men; however, this fact alone does not establish pretext. *See Holdmeyer v. Veneman*, 321 F. Supp. 2d 374, 382 (D. Conn. 2004), *aff'd sub nom.*, *Holdmeyer v. Dep't of Agric.*, 146 F. App'x 535 (2d Cir. 2005) (holding plaintiff failed to raise inference of discrimination where only evidence plaintiff adduced was fact that decisionmaker was different race). Moreover, the committee promoted at least one woman to managing director, (Pl.'s Opp. 17 n.21), which further undermines Plaintiff's assertion that the decision not to promote her was discriminatory.

With respect to the failure to promote in 2012, Garcia asserts that Gold's stated explanation for not advancing her candidacy is a pretext for discrimination because her most recent performance rating was "Exceeds Some, Meets All Expectations" and she improved the total Nobramex team business relative to the prior year. (Pl.'s Opp. 17.) These facts, while undisputed, simply fail to address Gold's stated reason for not nominating her: because she had not improved her individual production or performance, and he did not think the committee would promote her.[23] (Defs.' 56.1 ¶ 31.) Accordingly, Gold's legitimate business reason is unrebutted.

With respect to her burden at stage three, Garcia asserts that the same evidence

---

[23] Garcia's individual production and performance numbers decreased from $8,669,090 in 2011, (Defs.' 56.1 ¶ 27), to $3,799,215 in 2012, (*id.* ¶ 33).

supporting her prima facie claim, i.e., Gold's statements, (*see supra* Section IV.A.1), also proves

that the failure to promote her in 2010 or 2012 was motivated by her race and/or sex. However,

she does not even attempt to argue a nexus between any of Gold's statements and the failure to

promote her in 2010 and 2012. Moreover, at her deposition, Garcia testified that she did not

believe the failure to promote her in 2010 to be discriminatory, (Defs.' 56.1 ¶ 15; Garcia Dep.

211:20–23); however, she later challenged the decision, (Pl.'s Opp. 15).[24] Based upon my own

review of Gold's statements, I note that Gold's comment that he did not want Garcia to have a

"pity party" upon learning she was not selected for promotion is temporally related, (Defs.' 56.1

¶ 115); however, the statement occurred after Plaintiff was not promoted in 2010, and did not

inform the committee's decision making process.

Accordingly, in the face of the unrebutted, legitimate business explanations, and

considering the evidence contained in the record and drawing all inferences in Garcia's favor, I

find that no reasonable jury could conclude that Garcia's race or sex played a motivating factor

in Garcia's non-promotion to managing director in 2010 or 2012.

### b. Discretionary Incentive Awards

Garcia fails to rebut Barclays' explanation that the pay disparities are attributable to

legitimate, gender-neutral business considerations, namely that individual performance is a key

factor in determining discretionary incentive awards. Garcia does not identify, with specificity,

which male employees of Barclays she purports to be her comparators. However, Garcia does

argue that she "properly compares herself to men, most of them white, who were either heads of

---

[24] Plaintiff cannot create a triable issue of fact by contradicting her own sworn deposition testimony. *See, e.g., Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Plaintiff states that she had not reviewed the Attorneys' Eyes Only documents prior to her deposition and so she did not know the relative treatment of the male and female applicants. (Pl.'s Opp. 15 n.18; Garcia Decl. ¶ 41.)

teams or salespeople, with comparable evaluations of performance," (Pl.'s Opp. 17–18 (citing Defs.' 56.1 ¶¶ 230–53)), and the cited paragraphs of Plaintiff's Local Civil Rule 56.1 Statement that reference the following male employees of Barclays:  Huerta, Koch, Rizzo, Fernandes, Feola, Weston, and McNulty.  Thus, Garcia appears to claim that these seven men are her comparators, even though she does not specifically identify how she is similarly situated to these men.  (*See also* Defs.' 56.1 ¶ 228 ("As discussed infra, ¶¶ 234–53, comparable men were paid substantially more.")).

I note that there appear to be numerous, significant differences between Garcia and certain of these comparators, (*see infra* Section B.2); however, assuming without deciding that all seven comparators are appropriate, Garcia fails to demonstrate that Barclays' stated explanation is a pretext for discrimination.  Barclays has adduced substantial and undisputed evidence demonstrating that the factors it relies on in determining total compensation consist of:  "individual and team performance, meeting or exceeding established goals, market competitiveness, and the overall success of each business, including the firm's overall performance."  (Defs.' 56.1 ¶ 37.)  Garcia agrees that Barclays takes these factors into consideration in determining total compensation but argues that Barclays also considers additional factors such as:  an employee's performance rating; success in training junior employees; and demonstrated ability to cultivate relationships with clients.  (*Id.*)  However, these purportedly additional factors are better understood as criteria for evaluating whether an employee has demonstrated one or more of Barclays' stated factors, namely individual performance and/or meeting or exceeding established goals.  In addition, Garcia claims that Barclays considers additional "ad hoc factors" in determining compensation, such as:  "perceived need to reward employee loyalty, the intuition that Barclays could 'afford' to pay an employee

less, and the perceived need to pay more so that a high-value or aggrieved employee will not quit." (*Id*.) However, these "ad hoc factors" are all considerations that fall within the stated factor of market competitiveness. Moreover, Garcia does not claim and the record does not support that any of the additional factors or "ad hoc factors" are sex based criteria.

Personal performance, in other words "how good a year the person in question had"—as quantitatively measured by total production—is an important factor Barclays considers in determining discretionary compensation for its employees in EM Sales. (Gold Dep. 161:3-162:23.) Garcia understood that total production was a significant factor in determining discretionary compensation. (Garcia Decl. ¶¶ 12, 14, 15; Garcia Dep. 299:12-21.)

In every year at issue, with the exception of one man in a single year, Garcia's total production was significantly lower than the total production of each man she identifies as a comparator. (*See* Clark Decl. Ex. 80; Shea Aff. Exs. 12, 13, 34–36.)[25] Barclays calculated employees' annual payout percentage—the ratio of total compensation to total production—as one measure with which to compare employees' performance in a given year. (*See* Clark Decl. Ex. 80; Garcia Dep. 299:12-21 (Garcia testifying to her belief that she was compensated at the "lowest percentage" of all the producing sales managers in Latin America).) In fact, Garcia's payout percentage was frequently two or three times higher than other comparators' payout percentage. (*See* Clark Decl. Ex. 80.) Simply put, the undisputed facts demonstrate that Barclays used legitimate gender-neutral factors in determining compensation, and one of the most important of these factors in determining discretionary compensation for the EM Sales team was total production. Garcia's pay disparity is more than explained by the fact that her

---

[25] In 2009, Garcia's total production was approximately $10 million compared to Huerta's $7 million, and Garcia received a lower discretionary incentive award than Huerta; however, both individuals received the same total compensation. (*See* Clark Decl. Ex. 80.)

total production figures were routinely and significantly lower than the men whom she claims are her comparators.

Considering all the evidence contained in the record and Barclays' unrebutted gender-neutral explanation, Garcia's prima facie evidence of discriminatory intent, (*see supra* Section IV.A.1), fails to satisfy her stage three burden and prove that her race or sex played a motivating factor in her discretionary incentive awards. She does not argue any nexus between Gold's statements and her awards. Moreover, I find that none of Gold's statements are related to the decision making process related to personnel decisions concerning Garcia, and any temporal proximity between a statement and when a particular discretionary incentive award was paid or decided appears to be coincidence.

### c. Stripping of U.S. Accounts

Garcia argues that the reassignment of her U.S. accounts was motivated, at least in part, by race; however, Garcia fails to address Barclays' legitimate business reasons for the reassignment—that Gold wanted Garcia to focus on the Nobramex business and the preference for keeping U.S. revenues and Nobramex revenues segregated from one another. (Defs.' 56.1 ¶ 99.) In addition, four of the accounts that had been taken away from Garcia were re-assigned to Ana Sarmiento, a Latina. (Pl.'s Opp. 15; *see* Koch Decl. ¶ 3.) This fact further undercuts Garcia's claim that the reassignment of her U.S. accounts was motivated by race. *See Blasi v. N.Y. City Bd. of Educ.*, Nos. 00-CV-5320 (RRM)(MDG), 03-CV-3836 (RRM)(MDG), 2012 WL 3307227, at *15 (E.D.N.Y. Mar. 12, 2012), *aff'd*, 554 F. App'x 10 (2d Cir. 2013) (finding no inference of discriminatory intent where three of the four new hires following plaintiff's termination were members of same protected class).

Garcia relies on Gold's statements, (*see supra* Section IV.A.1), to satisfy her stage three

27

burden and prove that her race or sex played a motivating factor in Gold's decision; however, she does not draw any nexus between any statement and the reassignment of her U.S. accounts in 2010.  Moreover, I find that none of the statements are related to the reassignment temporally or otherwise.  Accordingly, in light of the unrebutted, legitimate business explanation, the fact that certain of the U.S. accounts were reassigned to a Latina woman, and the fact that Garcia does not put forward any additional evidence to bolster her claim, I find that no reasonable jury could conclude that Garcia's race or sex played a motivating factor in Gold's decision to reassign Garcia's U.S. accounts.

### d.  Selection for Reduction in Force

Garcia fails to rebut Barclays' legitimate business explanation for Gold's decision to eliminate her position and select her for the 2013 RIF.  It is undisputed that Garcia's position was eliminated and has not been re-filled.  (Defs.' 56.1 ¶ 34.)  Nevertheless, Garcia argues that Barclays' stated reason is a pretext for discrimination.  In support, Garcia notes that Gold selected a total of four Latina women and one non-Latina woman for inclusion in the various RIFs Barclays underwent in the six years subsequent to its acquisition of Lehman.  (Pl.'s Opp. 18–19.)  "Without contextual information" such as how many people in total reported to Gold at any given time and what proportion were women or Latinas, I find it unremarkable that five women were let go as part of reductions in force from Barclays after it had purchased portions of Lehman's business after its collapse during the six years spanning the world financial crisis.[26]
*See, e.g.*, *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 374 (S.D.N.Y. 2013) (opining that, in gender discrimination case involving RIF following the global financial crisis, statistics are relevant to support a discrimination claim and finding that the statistics offered by plaintiffs

---

[26] I also note that Gold himself was selected for a RIF in 2014.  (Gold Decl. ¶ 1.)

were insufficient to prove pretext); *LaMarch v. Tishman Speyer Props., L.P.*, No. 03 CV 5246 (CBA), 2006 WL 2265086, at *6 (E.D.N.Y. Aug. 8, 2006) (finding that "no rational jury could draw any inference" without "minimal data" such as number of employees within protected class and termination rate of those outside protected class).  Further, the fact that Sinclair—a Director in the human resources department who supported EM Sales where Gold and Garcia worked— urged Gold to include Garcia in the 2011 RIF, (Defs.' 56.1 ¶ 23; Sinclair Decl. ¶ 1), because in her opinion Garcia was not performing well, did not demonstrate potential for long-term success, and her belief that Garcia's role was not needed, (Sinclair Decl. ¶ 3), lends additional support for Gold's decision to include Garcia in the 2013 RIF.

In addition, Barclays' argument that Garcia's race and sex played no role in Gold's decision is bolstered by the undisputed fact that Gold made the decision to hire Garcia.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (noting that same actor inference—where "the person who made the decision to fire was the same person who made the decision to hire"—strongly suggests "invidious discrimination was unlikely"); *Schnabel*, 232 F.3d at 91 (holding same actor inference was "highly relevant" where manager who hired plaintiff fired him three years later); *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, (S.D.N.Y. 2007), *aff'd* 303 F. App'x 946, 948 (2d Cir. 2008).  Although Gold's decision to hire Garcia in 2008 was made about five years before his decision to include her in the 2013 RIF, Gold promoted Garcia to head of Nobramex in 2009, nominated her for Woman of the Year in 2010, nominated her for promotion to managing director in 2010 and 2011, did not include her in the 2011 RIF against the advice of a human resources Director, and included her on his long list of candidates in 2012.  These acts demonstrate Gold's repeated endorsement of Garcia as an employee, which is akin to a decision to hire, *see Figueroa v. N.Y.C. Health & Hosps. Corp.,* 500

F. Supp. 2d 224, 236 (S.D.N.Y. 2007), and served as validation of his initial decision to hire

Garcia in 2008. Accordingly, in light of the length of time between Gold's decision to hire

Garcia and decision to include her in the 2013 RIF, coupled with his intervening acts of

validation of Garcia's employment, I find that the same actor inference is warranted here. *See,

e.g.*, *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 101 (E.D.N.Y. 2010), *aff'd*, 461 F.

App'x 59 (2d Cir. 2012) (finding that because same individual was responsible for both the

creation and promotion of plaintiff to multiple managerial positions and the decision to terminate

plaintiff, the same actor inference applied and provided an inference that discrimination was not

a motivating factor in the decision to terminate plaintiff); *Byrne v. CNA Ins. Cos*., No. 98-CV-

885 HGMGJD, 2001 WL 35934693, at *8 (N.D.N.Y. July 6, 2001) (relying on same actor

doctrine and finding that plaintiff failed to establish that defendant's reason for discharge was a

pretext for discrimination where superior who hired plaintiff and discharged him three years later

had promoted him twice in the intervening time).

Weighed against Barclays' legitimate and unrebutted explanation for including Garcia in

the 2013 RIF and the same actor inference, Garcia fails to satisfy her stage three burden and

prove that Gold's decision to include her in the 2013 RIF was motivated, even in part, by her

race or sex. As was the case with the other adverse employment acts, Garcia does not assert any

nexus that links a statement by Gold to his decision to include her in the 2013 RIF. Upon my

own review of Gold's statements, I find that none of them are related to the decision making

process; however, one comment in 2012—"uh oh, this plane has Dominicans on it," (Defs.' 56.1

¶ 210)—could be viewed as temporally close in time to the 2013 RIF. Considering all the

evidence contained in the record in the light most favorable to Plaintiff, the unrebutted legitimate

business explanation, and the same actor inference, I find that no reasonable jury could conclude

that Gold's decision to include Garcia in the 2013 RIF was motivated, even in part, by her race or sex.

## B. Unequal Pay Claims Under EPA and NYLL

### 1. Applicable Law

The Equal Pay Act "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for equal work." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (internal quotation marks omitted). To establish a claim, a plaintiff must make an initial showing that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255–56 (2d Cir. 2014) (quoting *Belfi*, 191 F.3d at 135). "[P]roof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim." *Belfi*, 191 F.3d at 136 (citing *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 118 (2d Cir. 1997)); *see Littlejohn v. City of N.Y.*, 795 F.3d 297, 309 n.7 (2d Cir. 2015) (noting that under EPA, "liability turns on whether lesser pay is given for equivalent work-discriminatory motivation is not an element of the claim").[27]

If a plaintiff can make this prima facie showing, the burden of persuasion shifts to the employer to demonstrate that wage disparity is justified by one of the four affirmative defenses provided under the EPA: "(i) a seniority system; (ii) a merit system; (iii) a system which

---

[27] Claims under the federal and New York equal pay statutes are analyzed under the same standard. *See Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015) (summary order) (citation omitted); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570 (S.D.N.Y. 2012) ("Claims for violations of the Equal Pay Act and the New York State Equal Pay Act may be evaluated under the same standard." (quoting *Rose v. Goldman, Sachs, & Co., Inc.*, 163 F.Supp.2d 238, 243 (S.D.N.Y. 2001)); *Gibson v. Jacob K. Javits Convention Ctr.*, No. 95 Civ. 9728(LAP), 1998 WL 132796, at *2 (S.D.N.Y. Mar. 23, 1998) (evaluating claims under the federal and state statutes "simultaneously" and "under the Equal Pay Act rubric" because pleading standards are "identical")).

measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see Belfi*, 191 F.3d at 136. "[T]o successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Belfi*, 191 F.3d at 136. "Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'" *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (quoting *Belfi*, 191 F.3d at 136). "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526–27 & n. 1 (2d Cir. 1992) (internal quotation marks omitted).

### 2. Application

Barclays argues that it is entitled to summary judgment on Garcia's EPA and NYLL claims because Garcia fails to state a prima facie claim and, even if she had, Barclays is nevertheless entitled to summary judgment because an affirmative defense applies here; specifically that Barclays relied on factors other than sex in determining Garcia's compensation. With respect to the first element of the prima facie claim, Garcia appears to argue that Huerta, Koch, Rizzo, Fernandes, Feola, Weston, and McNulty are appropriate comparators. (*See supra* Section IV.A.3.ii.)

With respect to the second element of the prima facie claim, Plaintiff has failed to adduce evidence to demonstrate that each of the seven alleged comparators held a position substantially equal to hers. *See Lavin–McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (noting that

"'[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are 'substantially equal'' in skill, effort, and responsibility" (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995))).  Garcia argues that the determination whether two positions are substantially equivalent is a question for the jury, (Pl.'s Opp. 21); however, that is not the law and summary judgment is appropriate where "two positions [are] so different . . . that no reasonable juror could conclude that they are 'substantially equal,'" *Drury v. Waterfront Media, Inc.*, No. 05 Civ. 10646(JSR), 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007); *see Guglielmo v. Marchon Eyewear, Inc.*, No. 02 CV 5434(SLT), 2006 WL 398617, at *8 (E.D.N.Y. Feb. 16, 2006) (analyzing cases throughout Second Circuit and finding that "it is not the law in this Circuit that the second element [of an EPA claim] must be determined by a trier of fact").

Garcia has failed to produce any evidence upon which a reasonable jury could conclude that she held a substantially equivalent position to the positions held by Fernandes, Feola, Weston, McNulty, and Koch.  Garcia has not adduced any evidence beyond her own conclusory statement to support the claim that she and the EM Sales members—Fernandes, Feola,[28] Weston, and McNulty—held substantially equivalent positions.  (*See* Defs.' 56.1 ¶ 232 ("Garcia's responsibilities as an EM salesperson were equivalent to those of other Barclays EM salespeople regardless of any difference in their corporate titles.").)  The cases Garcia relies upon are distinguishable on the facts and the applicable legal standard, (*see* Pl.'s Opp. 21–22), because the difference between team leader and team member in EM Sales at Barclays is not akin to technically different corporate titles, *see Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO*

---

[28] Garcia's prima facie EPA claim with respect to Fernandes and Feola is further called into question in light of the fact that she earned more than each of them in 2009.  *See also Moccio*, 889 F. Supp. 2d at 571 (holding that plaintiff's "*prima facie* case fails for the alternative reason that just as many male [comparators] earned a lower salary as [plaintiff] as earned a higher one").

(*AFSCME*) *v. Nassau Cty.*, 609 F. Supp. 695, 707 (E.D.N.Y. 1985) (denying motion to dismiss and emphasizing that "on a 12(b)(6) motion, the court is not free to weigh the evidence" where plaintiff alleged same job titles involved substantially equal work), being in different departments of a university, *see Lavin–McEleney*, 239 F.3d at 483, working on different types of projects, *see Downes v. JP Morgan Chase & Co.*, No. 03 Civ. 8991 GEL MHD, 2006 WL 785278, at *27 (S.D.N.Y. Mar. 21, 2006), or having different but similar responsibilities, *see Scelfo v. Aurora Concept Inc.*, No. 02 Civ. 7835(MHD), 2006 WL 336038, at *10–11 (S.D.N.Y. Feb. 10, 2006) (denying summary judgment where parties did not dispute that plaintiff and male comparator worked "similar hours and had similar responsibilities"). The undisputed evidence demonstrates that Garcia held a position that was not substantially equivalent to the positions held by Fernandes, Feola, Weston, and McNulty. Most notably, these men did not manage a regional team, (Defs.' 56.1 ¶¶ 242, 245, 248, 251), whereas Garcia was "promoted to run" the Nobramex team as of March 2009, (*id.* ¶ 4). It is self-evident that a manager does not hold substantially the same position as the individuals she manages. Moreover, it is undisputed that being the head of a regional team is a more senior position and commands a higher level of responsibility than being a member of a regional team. (*Id.* ¶ 4 (Garcia characterizes the transition from team member of Nobramex to head of Nobramex as a promotion), ¶¶ 170, 173 (following the 2011 RIF, Garcia retains her "role as head of Nobramex" instead of losing her seat and transferring to the U.S. EM Sales Team as a member), ¶ 230 (Garcia states that each head of a regional team was her "counterpart" whereas the members on the regional teams were more junior and lacked "managerial responsibility"), ¶ 233 (the Barclays' organizational charts place the heads of regional teams on the same hierarchical level).)

In addition, the undisputed evidence demonstrates that Koch and Garcia did not hold

substantially equivalent positions. Koch and Garcia were both heads of a regional team, the U.S. and Nobramex teams, respectively, (*id.* ¶¶ 4, 237); however, Koch held a higher position than Garcia because he was more senior, had more responsibility, and had a higher corporate title, (*id.* ¶¶ 231, 237, 238). Moreover, Garcia reported to Koch for the last six years of her time at Lehman, (*id.* ¶ 50), Koch consulted with Gold in deciding whether to offer Garcia a job at Barclays in 2008 and whether to include Garcia in the 2011 RIF, (*id.* ¶¶ 54, 167), and Koch, as head of the U.S. EM Sales Team controlled more lucrative and prestigious accounts than the accounts Garcia controlled as head of the Nobramex team, (*id.* ¶¶ 68, 81, 86, 100, 238).

Accordingly, the undisputed evidence in the record supports the conclusion that Garcia held a position that was not substantially equivalent to the positions held by Fernandes, Feola, Weston, McNulty, and Koch. However, Garcia has stated a prima facie claim under the EPA and NYLL with respect to Huerta and Rizzo as her comparators because she was compensated less than each of these male employees in at least one year, (*see* Clark Decl. Ex. 80), and a reasonable jury could conclude that Huerta and Rizzo, as heads of regional teams, held substantially identical positions as Garcia, (Defs.' 56.1 ¶¶ 230, 233).

Even if I assumed that all seven of Garcia's alleged comparators held a position that was substantially equivalent to Garcia's position, Garcia's claims under the EPA and NYLL still fail because Barclays has proven an applicable affirmative defense—that it relied on factors other than sex in determining Garcia's compensation and had legitimate business reasons for implementing those factors. *See Forden v. Bristol Myers Squibb*, No. 99-CV-0907 (NAM) (RFT), Dkt. No. 51, at 11 (N.D.N.Y. Oct. 11, 2001), *aff'd* 63 F. App'x 14, 15 (2d Cir. 2003) (summary order) (holding that disparities in compensation "were due to a number of permissible factors including seniority, experience and performance").

As set forth in detail above, (*see supra* Section IV.A.3.ii), Barclays has adduced substantial and undisputed evidence demonstrating that Barclays and Gold used legitimate gender-neutral factors in determining compensation, the most important being total production. (*See* Defs.' 56.1 ¶ 37.)[29]  Garcia's pay disparity is more than explained by the fact that her total production figures were invariably and significantly lower than the men whom she claims are her comparators.  In the face of these undisputed facts, Garcia does not even attempt to rebut Barclays' affirmative defense.  Accordingly, her EPA and NYLL claims fail as a matter of law.

### C. *Plaintiff's NYCHRL Claims*

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL claim after dismissing all federal claims.  *See, e.g.*, *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454, 2014 WL 941821, at *1–2 (S.D.N.Y. Mar. 11, 2014); *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011).[30]

Here, I have dismissed all claims over which I had original jurisdiction.  Accordingly, I decline to exercise supplemental jurisdiction over Plaintiff's NYCHRL cause of action, and Garcia's claims under the NYCHRL are dismissed without prejudice to refiling in state court.

---

[29] It is undisputed that each of these factors had legitimate business purpose.

[30] "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Indeed, "when federal claims are dismissed early in the litigation—for example, before trial on a summary judgment motion—dismissal of state law claim is appropriate."  *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *3 (S.D.N.Y. July 15, 2002).  "Moreover, comity counsels against exercising jurisdiction over Plaintiff's NYCHRL claim[s], as the NYCHRL has a lower threshold of proof than its federal counterparts and has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it."  *Harris*, 2014 WL 941821, at *2 (citation omitted).

## V.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Garcia's causes of action under Title VII, NYSHRL, Section 1981, the EPA, and NYLL; in light of the fact that I have dismissed all claims over which I had original jurisdiction, I decline to exercise supplemental jurisdiction over Plaintiff's cause of action under NYCHRL and thus Garcia's claims under the NYCHRL are dismissed without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to terminate all open motions and close the case.

SO ORDERED.

Dated:  November 15, 2017
        New York, New York

Vernon S. Broderick
United States District Judge